UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

HARRY ZEA, RHC LLC, HOLD ON! LLC,
1355 MARLIN DRIVE LLC, 1660 DOLPHIN
COURT LLC, 1501 BLUEFIN COURT LLC,
PINNACLE ASSET TRUST LLC, BAY CLUB
OF NAPLES I LLC, BAY CLUB OF NAPLES II
LLC, THE NAUTILUS NAPLES, LLC,

      Plaintiffs,

v.

                            Case No.: 2:22-cv-690-JLB-NPM

CITY OF NAPLES, a Florida Municipal
Corporation, WILLIAM BARNETT,
individually and in his capacity as former
Mayor of the City of Naples, CRAIG MOLÉ,
individually and in his capacity as the
Chief Building Official of Naples,

      Defendants.
_____/

## ORDER

This matter comes before the Court on Defendants' Joint Motion to Dismiss

Plaintiffs' Amended Complaint (Doc. 29).  Plaintiffs responded (Doc. 33), Defendants

filed a reply (Doc. 40), and Plaintiffs filed a sur-reply (Doc. 44).  For the reasons set

forth below, the Motion to Dismiss is **GRANTED in part** and **DENIED in part**.

## BACKGROUND[1]

Mr. Zea is a Naples real estate developer who develops properties worth hundreds of millions of dollars throughout the United States.  (Doc. 28 at ¶ 15).  As part of his real estate development business, Mr. Zea purchased two groups of properties in Naples through companies he controlled: (1) the Bay Club properties and (2) a group of single-family homes (the "Homes") in the Royal Harbor neighborhood.  (*Id.* at ¶ 16).

Mr. Zea obtained permits to begin construction or repair on these properties and met with Mayor William Barnett on several occasions.  (*Id.* at ¶ 19).  Mayor Barnett expressed his excitement to work with Mr. Zea both publicly and privately. (*Id.*)  Plaintiffs allege that at some point, "Mayor Barnett began to make disparaging comments, publicly and in email exchanges" about Mr. Zea and his projects, "expressing an intent to actively work against him, with the intentional effect of dissuading others to work with him in order to harm [Mr. Zea's] businesses and drive him out of Naples."  (*Id.* at ¶ 21).  Plaintiffs also allege that other city officials and employees "at all levels of city government" assisted Mayor Barnett in his "campaign" against Mr. Zea.  (*Id.* at ¶ 22).  By way of example, Plaintiffs allege that at a public function and fundraiser, the former City Manager "used an expletive" referring to Mr. Zea and his companies and stated "we're not doing

---

[1] "At the motion to dismiss stage, all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff."  *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1273 n. 1 (11th Cir. 1999) (citation omitted).  Accordingly, this background section relies on the facts recited in the Amended Complaint.  (*See* Doc. 28).

anything for him." (*Id.* at ¶ 23).  Plaintiffs allege that this became city policy and that it "permeated all City government levels and influenced City decisions, and actions in regard to [Mr. Zea] and his companies." (*Id.* at ¶¶ 23–24).  Plaintiffs further allege that city officials made statements "ranging from false to outrageous, with the purpose of harming Mr. Zea's reputation with lenders and others in the Naples financial community to harm, or eliminate, future business opportunities." (*Id.* at ¶ 25).  Plaintiffs claim that Mr. Zea became "part of a class of developers disfavored by the city and its body politic." (*Id.* at ¶ 26).

Bay Club Properties

The Bay Club properties were a set of two existing structures to be converted to mixed-use buildings in Naples's commercial waterfront district. (*Id.* at ¶¶ 17, 28).  Plaintiffs explain that permission to re-develop the Bay Club Properties took years and great expense to obtain. (*Id.* at ¶ 29).  In June 2016, via a City Council resolution, the City approved a non-conformity petition for the project. (*Id.* at ¶ 30). Plaintiffs explain that the non-conformity petition "allowed the building to be grandfather[ed] under an old code provision permitting building heights greater than 42 feet." (*Id.* at ¶ 31).  Plaintiff further explains that because of that non-conformity, it was important that the building *not* be entirely demolished, and thus subject to the new restriction. (*Id.*)  Rather than demolishing an entire building, Plaintiff instead proposed partially demolishing it and thereafter replacing portions of that building so that it could retain its non-conforming status. (*Id.*)  In all events, the City issued permits for the project in April and June 2017. (*Id.* at ¶ 32).

On October 23, 2018, Chief Building Official Molé issued, without warning, a stop-work order for Bay Club, explaining that the stop-order was issued to "bring the Bay Club properties into compliance with Florida Building Code §§ 110.7 and 110.8 regarding shoring and inspections required for a threshold building." (*Id.* at ¶ 33). According to Plaintiffs, those issues were addressed the next day. (*Id.* at ¶ 34). On October 25, 2018, Mr. Molé emailed another stop-work order which allegedly "lacked any required documentation and, though unclear, apparently relat[ed] to demolition." (*Id.* at ¶ 35).

Two weeks later, a code enforcement notice of violation was issued for Bay Club which stated yet another basis for violation. (*Id.* at ¶ 36). That notice "related to building demolition, for which information had already been fully provided to the City as early as March 2018" and was discussed with Mr. Molé. (*Id.*) The notice alleged that no work had been done to address certain issues, but Plaintiffs allege that fixing those issues would have been impossible because of the earlier stop-work order. (*Id.* at ¶ 37). The issues cited in the original stop-work order were allegedly corrected, but the stop-work order was not withdrawn, even though the City was repeatedly advised that the issues had been corrected. (*Id.* at ¶ 38).

In what Plaintiffs call a "total departure from the City's permitting rules and practice," the violation notice requires notice to re-obtain a demolition permit and remove the remainder of the structure. (*Id.* at ¶ 39). Plaintiffs allege that this departure treated Mr. Zea and the Bay Club properties differently than two other commercial redevelopment projects in Naples, which they claim were similarly

situated to the Bay Club redevelopment project and the Bay Club properties in all relevant respects. (*Id.* at ¶ 40).

Like the Bay Club properties, the two commercial projects identified by Plaintiffs were also approved as non-conforming remodels but they were allowed to maintain their non-conforming status despite one project removing and replacing the entire original structure while the other project left only one wall from the original building standing. (*Id.*) And neither of these other redevelopment projects was stopped for demolition issues or faced potentially losing non-conforming status, even though the developers in both redevelopment projects demolished "far more" of the original structures than Mr. Zea demolished in the Bay Club redevelopment project. (*Id.*)

Plaintiffs allege that Mr. Zea was thereafter advised by the City Attorney not to appear at a November 2018 code enforcement proceeding regarding the Bay Club properties code violation. (*Id.* at ¶ 41). At that hearing, Mr. Molé stated that he had not reviewed the plans himself after demolition began and that he had never previously reviewed the permits. (*Id.* at ¶ 42). He also stated that the project "may have been permitted incorrectly and reviewed incorrectly by [the] private provider inspection agency." (*Id.*) The Code Enforcement Board imposed significant fines under what Plaintiffs refer to as the "unprecedented threat" of tearing down the structure, for which millions of dollars of work had already been completed. (*Id.* at ¶ 43). Then, Plaintiffs allege that Mayor Barnett and the City began to actively work to impede Mr. Zea's development and force a sale of the Bay Club project to

5

someone the City favored.  (*Id.* at ¶ 44).  According to Plaintiffs, "Mayor Barnett went so far as to call the family member of a campaign supporter to discuss having the family member buy the Bay Club properties even though it was not for sale." (*Id.*)

In September 2019, Mayor Barnett stated in a recorded interview that the Bay Club properties had been foreclosed on and had been taken over by a company that was "pretty easy to work with," which statements Mayor Barnett allegedly knew were false.  (*Id.* at ¶ 45).  He further stated that his "goal [was] to knock it down," and that he had "wanted it down since last April."  (*Id.*)

Due to the delay in construction, the Bay Club properties filed for bankruptcy in June 2020 and Mr. Zea purchased the assets of the project through another company, Nautilus Naples, LLC.  (*Id.* at ¶¶ 46–47).

The Homes

The Homes were four lots on which Mr. Zea intended to construct and sell single-family multi-million-dollar homes.  (*Id.* at ¶¶ 18, 48).  The Homes consist of 1501 Bluefin Court, 1355 Marlin Drive, 1800 Snook Drive, and 1660 Dolphin Court, "all of which have now been built and sold to other owners."  (*Id.* at 18).

In July 2018, an individual not named in the Amended Complaint complained to Mayor Barnett via email about Mr. Zea's properties, stating, "This has all the indications of a [P]onzi scheme getting ready to blow up."  (*Id.* at ¶ 49). Mayor Barnett responded, "I don't disagree with you."  (*Id.* at ¶ 50).

The Amended Complaint alleges that in November 2018, Mr. Molé stated

6

that he would not reissue a permit for 1501 Bluefin Court as long as Mr. Zea was involved with the property. (*Id.* at ¶ 51). In line with Mr. Molé's alleged prior statement, Plaintiffs allege that Mr. Molé reissued the permit *after* the property was sold to another entity and proof of new ownership was shown. (*Id.*) The Amended Complaint alleges that the only change to the project was the change in ownership. (*Id.* at ¶ 52).

In February 2019, the same individual who complained to Mayor Barnett in July 2018 emailed a City Council member, a friend of that individual, complaining about Mr. Zea's projects and asking the City to look into them. (*Id.* at ¶ 53). When the email was forwarded to Mayor Barnett, he responded, "I can assure you we are all over this! I have been involved from the start. There are also many legal issues going on with [Mr. Zea] as I write, and the City has taken and will continue to take a strong stand against him." (*Id.*)

And after he received an email from the same individual in August 2019, Mayor Barnett responded: "We are in the middle of many lawsuits with Mr. Zea. We are familiar with his every move and are moving as fast as possible to do whatever necessary to put an end to the grief and anguish he is causing." (*Id.* at ¶ 56). Plaintiffs aver that Mayor Barnett's statements were false because there were no City lawsuits involving him at that time. (*Id.* at ¶ 57). Mayor Barnett's email was forwarded to a City Council member, stating: "It appears from what Bill conveyed that the City is in the midst of getting Zea. This is good news." (*Id.* at ¶ 58). The City Council member responded, "I was very happy to hear that too!" (*Id.*

at ¶ 59).

In the same September 2019 interview referenced above, Mayor Barnett stated that three of the Homes were foreclosed on in Royal Harbor and that "things are moving along in that respect," which statements the Amended Complaint alleges were also false.  (*Id.* at ¶ 60).

According to the Amended Complaint, in November 2019, Mr. Molé, on behalf of the City of Naples building department, directed an individual to send a proposed email to the Royal Harbor Homeowners Association.  (*Id.* at ¶¶ 61–63).  The email copied Mayor Barnett, Mr. Molé, and other city personnel.  (*Id.*)  The proposed email stated that the "City of Naples Building Department (Craig Molé) would like to know if Royal Harbor residents are in favor of having the City of Naples condemn the properties" and to ask residents to indicate whether they would like the City to continue to reissue permits or refuse to reissue the permits to the builder and require the buildings to be demolished.  (*Id.* at ¶¶ 63–65).  Mayor Barnett responded, "Let me know what I can do to help in any way I can."  (*Id.* at ¶ 66).  The HOA representative responded that the HOA did not wish to be involved and that the City should "use its regular methods to work through the process."  (*Id.* at ¶ 67).  Accordingly, no email was sent to Royal Harbor residents "to avoid inserting the HOA in the process."  (*Id.*)

Permitting issues continued into 2020 for the Homes, including the revocation of, or not renewing, permits previously granted for properties that had substantial work completed over a period of years, and which had at least 85

8

percent of work completed.  (*Id.* at ¶ 68).  Plaintiffs admit that the original permits were issued under the fifth edition of the Florida Building Code and that the sixth edition went into effect in 2017; but they clarify that extensions were granted until 2019 (two years after the new Florida Building Code went into effect) and because of issues with a new contract, the City said that the latest extensions had expired, but Mr. Zea resolved the contractor issues and requested that the permits be re-issued in February 2020.  (*Id.* at ¶¶ 69–72).  The Amended Complaint also states that "[i]n actuality, based on hurricane and other tolling, the permits were still valid at that time."  (*Id.* at ¶ 73).  Nevertheless, Mr. Molé stated that either the new permits would need to meet the new Code standards or the building official would be authorized to require that any work at the site must be removed.  (*Id.* at ¶ 74).

The Amended Complaint further alleges that during a code enforcement hearing, a building official provided a sworn statement that "the City has never required a building to be demolished under such circumstances where the properties had been substantially completed."  (*Id.* at ¶ 75).  The Building Department asked for a series of requirements that Mr. Zea never anticipated and that the Amended Complaint alleges were not "customarily asked of new-construction residences, including a mold inspection and spot surveys."  (*Id.* at ¶ 76).  Further, Plaintiffs state that "[n]othing had physically changed with the properties, but the interference imposed by the City made clear [that] the City wanted the Homes to go to a new developer."  (*Id.*)

<u>Other actions alleged by the Amended Complaint</u>

Plaintiffs claim that the City's actions for each group reflected "an overall and pervasive scheme to target [Mr. Zea] and his companies' properties and force him out of business in Naples." (*Id.* at ¶ 77). Plaintiffs complain that Mr. Zea was regularly unable to properly communicate with City personnel or bodies, which led to delay and waste, and which reflected "a course of conduct at every level to interfere with Mr. Zea's projects and run him out of business, including by threatening arrest on multiple occasions." (*Id.* at ¶¶ 78–79).

For example, in 2020, Mr. Zea went to Mr. Molé's office to drop off paperwork, but Mr. Molé did not let him into the office and instead called the police, "falsely accusing Zea of misconduct." (*Id.* at ¶ 80). Mr. Zea was then pulled over by police "for no lawful reason as he left." (*Id.*) He was allegedly released when police realized no law had been broken. (*Id.*) Moreover, as recently as February 2022, Mr. Zea's attorney was scheduled to have a meeting at City Hall and, when he indicated that Mr. Zea would attend to answer any questions, the City Attorney informed the attorney that the meeting could not take place at City Hall because Mr. Zea "would be arrested for trespass" if he came there, "based on a policy in place only as to [Mr. Zea] initiated by the former City Manager." (*Id.* at ¶ 81). Mr. Molé stated that "his hands were tied" regarding Mr. Zea's property and that "everything happening was being dictated by persons above him, referring to City officials, including Mayor Barnett." (*Id.* at ¶ 82).

The Amended Complaint alleges that the City actively sought to hurt Mr.

Zea's reputation and dissuade lenders from doing business with him by telling bank representatives that the City would not issue project permits if he was involved. (*Id.* at ¶ 83).  Mr. Zea eventually relocated his family to outside of Naples "to avoid the repeated and unwarranted threats."  (*Id.* at ¶ 84).

Finally, the Amended Complaint alleges that as a result of Defendants' actions, Plaintiffs have been damaged, "including by suffering lost profits related to Bay Club and the Homes and by suffering significant improper fines and fees related to the Defendants' actions, including attorney's fees and costs."  (*Id.* at ¶ 85).

On October 21, 2022, Plaintiffs filed their initial complaint.  (*See* Doc. 1).  On December 16, 2022, Plaintiffs filed their Amended Complaint, which is the operative complaint before the Court.  (*See* Doc. 28).  Defendants filed their Motion to Dismiss on December 19, 2022.  (*See* Doc. 29).

## LEGAL STANDARD

Federal Rule of Civil Procedure 8 requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  And Federal Rule of Civil Procedure 12(b)(6) allows a complaint to be dismissed for failure to state a claim upon which relief can be granted.  To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  This standard of plausibility is met when the plaintiff pleads enough factual content "to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*

11

When reviewing a motion to dismiss, courts must accept all factual allegations contained in the complaint as true and view the facts in the light most favorable to the plaintiff.  *Erickson v. Pardus*, 551 U.S. 89, 93–94 (2007).  Legal conclusions, however, "are not entitled to the assumption of truth."  *Ashcroft*, 556 U.S. at 664.  "[C]onclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal."  *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003).

## DISCUSSION

### I.   <u>Counts I, II, and III: Equal protection claims.</u>

The Amended Complaint's equal protection claims are "class of one" claims because they "allege not that [Plaintiffs] belong[] to a protected class, but that [they] [are] the only entit[ies] being treated differently from all other similarly situated entities."  *Chabad Chayil, Inc. v. School Bd. of Miami-Dade Cnty*, 48 F.4th 1222, 1223 (11th Cir. 2022).  To prevail, Plaintiffs must show that they "ha[ve] been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  *Id.* (citing *PBT Real Est., LLC v. Town of Palm Beach*, 988 F.3d 1274, 1285 (11th Cir. 2021)).

The Eleventh Circuit applies the similarly situated requirement "with rigor." *Id.* (quoting *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1207 (11th Cir. 2007)).  The entities compared must be "*prima facie* identical in all relevant respects."  *Id.* (citing *PBT Real Est., LLC*, 988 F.3d at 1285).  "A plaintiff must ultimately show that it and any comparators are similarly situated in light of all the factors that would be

relevant to an objectively reasonable governmental decisionmaker." *Id.* (internal quotation marks omitted) (quoting *Douglas Asphalt Co. v. Qore, Inc.*, 541 F.3d 1269, 1275 (11th Cir. 2008)); *see also Griffin Indus., Inc.*, 496 F.3d at 1207 ("[W]hen plaintiffs in class of one cases challenge the outcome of complex, multi-factored government [decision-making] processes, similarly situated entities must be very similar indeed.").

### A.  Count I: Bay Club properties

Plaintiffs allege that a violation "required notice to re-obtain a demolition permit and remove the remainder of the structure." (Doc. 28 at ¶ 39).  They further allege that this was a "departure" from the City's permitting rules and practices that "treated Zea and his Bay Club properties differently than two other commercial redevelopment projects in Naples." (*Id.* at ¶¶ 38–39).  The Amended Complaint alleges the following about the two other commercial redevelopment projects:

- "These two other commercial redevelopment projects were similarly situated to the Bay Club redevelopment project and the Bay Club properties in all relevant respects." (*Id.* at ¶ 40).

- "Like the Bay Club project, both of these commercial projects were approved as non-conforming remodels and allowed to maintain their non-conforming status despite one project removing and replacing the entire original structure while the other project only left standing one wall from the original building." (*Id.*)

- "Neither of these redevelopment projects were stopped for demolition issues

or faced potentially losing non-conforming status, even though the developers in both redevelopment projects demolished far more of the original structures than Zea demolished in the Bay Club redevelopment project." (*Id.*)

The Amended Complaint further contains several allegations showing that the difference in treatment between the two other commercial redevelopment projects and the Bay Club redevelopment projects was irrational and arbitrary:

- "[Mr.] Molé stated that, despite multiple communications with him during the construction process, he had not reviewed the plans himself *after* demolition began, stated he had never previously reviewed the permits, and that 'it may have been permitted incorrectly and reviewed incorrectly by their private provider inspection agency.'" (*Id.* at ¶ 42).

- "In September 2019, Mayor Barnett spoke in a recorded interview with two local real estate agents . . . stat[ing] that, 'speaking of eyesores,' the Bay Club properties had been foreclosed on and had been taken over by a company that was 'pretty easy to work with,'" which statements Plaintiffs allege were untrue. He further stated that "[their] goal [was] to knock it down." (*Id.* at ¶ 45).

Defendants claim that the issues that impacted Plaintiffs' development projects "were not the product of a one-dimensional decision[] by the city" and that Plaintiffs' effort to establish the similarity of the two commercial development properties to the Bay Club properties was not "meaningful" enough. (Doc. 29 at 6). But the Court cannot consider these alleged facts on a motion to dismiss. *See*

*Bickley v. Caremark RX, Inc.*, 461 F.3d 1325, 1329 n.7 (11th Cir. 2006) ("A court is generally limited to reviewing what is within the four corners of the complaint on a motion to dismiss[,]" excepting documents referred to in the complaint that are central to the plaintiff's claim).  In support of their argument, Defendants also cite *Greenbriar Village, LLC v. Mountain Brook, City*, which states that "[t]he avoidance of the harms attendant to half-completed construction is a constitutionally permissible objective for a municipality when enforcing its building code."  345 F.3d 1258, 1263 (11th Cir. 2003).  But that case is inapposite at this juncture because the Amended Complaint alleges that the similarly situated comparators were not stopped for demolition issues and faced with losing non-confirming status.  (Doc. 28 at ¶ 40).  While any nondiscriminatory motivations would become relevant during the summary judgment stage, it does not move the needle at this early stage of the case when the only relevant facts and motives are those alleged in the Amended Complaint.

Plaintiffs' allegations are sufficient to survive a motion to dismiss because the Amended Complaint contains more than naked assertions that do not afford the City fair notice of the factual basis upon which the claim rests.  *See Twombly*, 550 U.S. at 554–55 (explaining that Federal Rule of Civil Procedure 8(a)(2) exists to "give the defendant fair notice of what the claim is and the grounds upon which it rests"); *compare Pillitieri v. City of Flagler Beach*, No. 3:16-cv-1121-J-34PDB, 2017 WL 3840433, at *4 (M.D. Fla. Sept. 1, 2017) (granting motion to dismiss where complaint "contain[ed] a single boilerplate reference to 'similarly situated

applicants'" and "d[id] not identify a single comparator that was allegedly treated more favorably or even any characteristics of a comparator or a comparator's property"), *with Disser v. City of Tampa*, No. 8:13-cv-885-T-24-EAJ, 2013 WL 3975759, at *10 (M.D. Fla. July 31, 2013) (motion to dismiss denied where a count "identifie[d] other similar establishments located in the [same] [d]istrict that received the same waivers sought by [p]laintiffs . . . and were approved for the special use permit sought by [p]laintiffs" and where plaintiffs sufficiently alleged that "the difference in treatment was wholly irrational and arbitrary"). Accordingly, Defendants' motion is denied as to Count I.

## B. Count II: 1501 Bluefin property

With respect to the 1501 Bluefin property, Plaintiffs allege that "[i]n November 2018, [Mr.] Molé stated that he would not reissue a permit for 1501 Bluefin Court as long as [Mr.] Zea was involved with the property." (Doc. 28 at ¶ 51). Indeed, after the property was sold to another entity and proof of ownership was shown to Mr. Molé, he reissued the permit. (*Id.*) The Amended Complaint alleges that "[t]here [was] no change to the project to support this reissue, only a change in ownership." (*Id.* at ¶ 52). In other words, the Amended Complaint alleges that Mr. Molé refused to issue a permit for 1501 Bluefin because Mr. Zea was involved but issued a permit to a *new* owner for the same, unchanged property. Defendants aver that "[w]hile Plaintiffs alleged that no changes occurred to the property, Plaintiffs omitted whether the other developer changed anything on the permit request or application." (Doc. 29 at 7). While the burden to establish a

similarly situated comparator is a high one (*see Griffin Industries, Inc.*, 496 F.3d at 1204–05), the Court will not require Plaintiffs to foresee every possible difference that Defendants may raise in response to their allegations.  Again, to the extent that Defendants had non-discriminatory reasons to deny and then issue the permit, the appropriate time to bring that argument is at the summary judgment stage.

Viewing the facts alleged in the Amended Complaint as true, as the Court must at this stage, Plaintiffs adequately allege that they were treated differently from an applicant who was similarly situated in all relevant respects—the same building, but with a different owner—without a reason.  Accordingly, Defendants' motion is denied as to Count II.

### C. Count III: 1355 Marlin, 1660 Dolphin, and 1800 Snook properties

As to 1355 Marlin, 1660 Dolphin, and 1800 Snook, the Amended Complaint states that "[a]s part of the permitting process, the Building Department asked for a series of requirements never anticipated or customarily asked of new-construction residence, including a mold inspection and spot surveys."  (Doc. 28 at ¶ 76).  The Amended Complaint alleges that these demands were based on "personal animus towards Plaintiffs, not any legitimate government purpose" and that Defendants "treated Plaintiffs and these properties differently than all other new-construction residences."  (*Id.* at ¶ 114).

The Court cannot find that these allegations are sufficient as pleaded because "all other new-construction residences" is not specific enough to meet the burden of a sufficiently similar comparator.  *See Grider v. City of Auburn, Ala.*, 618 F.3d 1240,

17

1264 (11th Cir. 2010) ("To be similarly situated, the comparators must be prima facie identical in all relevant respects") (citations and internal quotation marks omitted); *see also Manseau v. City or Miramar*, 395 F. App'x 642, 646 (11th Cir. 2010) ("Bare allegations that other applicants, even all other applicants, were treated differently do not state an equal protection claim; a complaint must attempt to show in some fashion that these other applicants were similarly situated to plaintiff.").

Accordingly, the Motion to Dismiss is granted as to Count III.

## II.   Count IV: Substantive due process claim.

"The substantive component of the Due Process Clause protects those rights that are fundamental, that is, rights that are implicit in the concept of ordered liberty." *McKinney v. Pate*, 20 F.3d 1550, 1556 (11th Cir. 1994) (quoting *Palko v. Conn.*, 302 U.S. 319, 324 (1937)).  "Fundamental rights are those rights created by the Constitution." *Greenbriar Village, L.L.C.*, 345 F.3d at 1262 (citing *DeKalb Stone, Inc. v. County of DeKalb, Ga.*, 106 F.3d 956, 959 n.6 (11th Cir. 1997)).  The scope of substantive due process is quite narrow, and federal appellate courts have "cautioned against the open-ended judicial expansion of other unenumerated rights" in substantive due process jurisprudence. *Dacosta v. Nwachukwa*, 304 F.3d 1045, 1048 (11th Cir. 2002).

"Property interests, of course, are not created by the Constitution.  Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source of state law." *Id.* (quoting

*Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972)).  Accordingly, to the extent that Plaintiffs predicate their substantive due process claim directly on the denial of their property rights in the Bay Club properties and the Homes, no substantive due process claim is viable.  *See id.* (citing *McKinney*, 20 F.3d at 1560).

Rather than base their argument specifically on denial of their property rights, Plaintiffs claim that Defendants' actions violate substantive due process by shocking the conscience.  (Doc. 33 at 8).  Indeed, the Eleventh Circuit previously found:

> Conduct by a government actor that would amount to an intentional tort under state law would only rise to the level of a substantive due process violation if it "shocks the conscience" or interferes with rights "implicit in the concept of ordered liberty" –in other words, only if it affects individual rights guaranteed, explicitly or implicitly, by the Constitution itself.

*Dacosta*, 304 F.3d at 1048.

"[T]he due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 848 (1998).  And "the Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process." *Id.* "[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Neal ex rel. Neal v. Fulton Cnty. Bd. of Educ.*, 229 F.3d 1069, 1074 (11th Cir. 2000). For example, in *Rochin v. California*, 342 U.S. 165, 172–73 (1952), the Supreme

Court "found the forced pumping of a suspect's stomach enough to offend due process as conduct that shocks the conscience and violates the decencies of civilized conduct." *Cnty. of Sacramento*, 523 U.S. at 846–47 (citing *Rochin*, 342 U.S. at 172–73).

The Eleventh Circuit has applied this concept sparingly. For example, in *Kessler v. City of Key West*, plaintiffs filed a lawsuit stating that the City of Key West "unreasonably escalated a minor code violation relating to their floating home, abused the legal process to terminate the lease and get rid of them, and indirectly caused the loss of their home." No. 21-11069, 2022 WL 590892, at *1 (11th Cir. Feb. 28, 2022). The Eleventh Circuit affirmed the district court's dismissal of the claim, finding that the City's conduct in "pursuing code enforcement, eviction, and then termination of the lease" did not plausibly meet the "shocks the conscience" standard. *Id.* at *4.

Plaintiffs argue that "Barnett's attempt to sell Zea's property to a family member of a campaign supporter, his attempts to privately dissuade banks from loaning to Zea, Defendants' defamatory statements about Zea and his properties, their policy banning Zea from City buildings, and their threats of arrest and false police calls" shock the conscience. (Doc. 44 at 2–3). The Court agrees that the behavior alleged is disturbing, ***particularly for public officials***. Notwithstanding, the Court finds that, even reviewing the complaint in the light most favorable to Plaintiffs, Defendants' alleged conduct is not so outrageous as to "shock the conscience" and state a substantive due process claim. Accordingly, the

Motion to Dismiss is granted as to Count IV.

### III.   <u>Count V: Conspiracy claim</u>

The elements of a cause of action under 42 U.S.C. § 1985(3) are:

> (1) a conspiracy, (2) for the purpose of depriving, either directly or indirectly, any person or class or persons of the equal protections of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy, (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

*Childree v. UAP/GA CHEM, Inc.*, 92 F.3d 1140, 1146–47 (11th Cir. 1996) (citing

*Lucero v. Operation Rescue*, 954 F.2d 624, 627 (11th Cir. 1992)).  "The second

element requires a showing of some 'racial, or perhaps otherwise class-based,

invidiously discriminatory animus behind the conspirators' action.'"  *Id.* at 1147

(quoting *Lucero*, 954 F.2d at 528).  "Section 1985(3) provides no substantive rights

itself; it merely provides a remedy for violation of the rights it designates."  *Great*

*Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 372 (1979).

Count V of the Amended Complaint alleges that "Defendants entered into a

conspiracy with certain other city officials and private parties to punish Plaintiffs as

a 'class of one' and drive them into bankruptcy."  (Doc. 28 at ¶ 128).  It also alleges

that the conspiracy "intended to deprive Plaintiffs of their right to equal treatment

under the Equal Protection Clause of the 14th Amendment and their right to be free

from arbitrary executive action under the Substantive Due Process Clause through

the actions alleged herein."  (*Id.*)  The Court has already found that some of

Plaintiffs' claims under the Equal Protection Clause will survive the motion to

dismiss while others will not (*see supra*, § I) and that the substantive due process claims will not survive the motion to dismiss (*see supra*, § II).

Aside from the arguments about the alleged violation of Plaintiffs' rights, Defendants set forth two arguments in support of dismissal of this claim.  First, Defendants argue that the Eleventh Circuit has declined to extend § 1985(3) to apply in non-racial contexts.  (Doc. 29 at 16).  Second, Defendants argue that under the intracorporate conspiracy doctrine, it is impossible for a legal entity consisting of the corporation (here, presumably, the County) and its agents (presumably Mr. Molé and Mayor Barnett) to conspire amongst each other.  (*Id.* at 16–17).

As an initial matter, the Supreme Court has held that section 1985 conspiracy claims do not reach conspiracies motivated by economic or commercial animus, which the Amended Complaint could be construed to allege here.  *See United Bhd. Of Carpenters, Local 610 v. Scott*, 463 U.S. 825, 837–39 (1983).  But even if other motivations were at play in this case, the Amended Complaint does not sufficiently allege that Plaintiffs were a member of a class of individuals falling within the plain meaning of section 1985(3).

Plaintiffs point the Court to *Lyes v. City of Riviera Beach*, 166 F.3d 1332, 1336–40 (11th Cir. 1999), where the Eleventh Circuit considered whether women were a qualifying class under § 1985(3).  The Eleventh Circuit looked to the language of the statute, which stated that it applied to, among others, conspiracies depriving "any person or class of persons of the equal protection of the laws."  *Lyes*, 155 F.3d at 1336 (quoting 42 U.S.C. § 1985(3)).  The Eleventh Circuit did not

consider the outer limits of section 1985(3) coverage, but decided the limited question of "whether § 1985(3) protects women as a class of persons from sex-based conspiracies against them where the conspirators were acting under color of state law." *Id.* at 1336–37. After finding that women are within the plain meaning of "any . . . class of persons," the *Lyes* court noted that its "enthusiasm for applying the plain meaning canon to § 1985(3) [was] tempered" by certain of the Supreme Court's decisions. *Id.* at 1337. Specifically, the Eleventh Circuit reasoned that in *Griffin v. Breckenridge*, 403 U.S. 88 (1971), the Court "glossed the statutory language with a caution against reading § 1985(3) so broadly (literally) as to turn it into 'a general federal tort law' that would 'apply to all tortious, conspiratorial interferences with the rights of others.'" *Lyes*, 166 F.3d at 1337 (quoting *Griffin*, 403 U.S. at 101–02). Expounding upon the Court's reasoning in *Griffin*, the Eleventh Circuit explained that the Supreme Court held the statute prohibits only conspiracies motivated by "some racial, or *perhaps* otherwise class-based invidiously discriminatory animus." *Id.* (quoting *Griffin*, 403 U.S. at 102). The *Lyes* court observed that in *United Brotherhood of Carpenters & Joiners v. Scott*, 463 U.S. 825 (1983), the Supreme Court held that § 1985(3) does not reach "conspiracies motivated by bias towards others on account of their economic views, status, or activities." *Id.* (quoting *Scott*, 463 U.S. at 837). In both cases, the Supreme Court withheld judgment on whether § 1985(3) extends beyond "its central concern" or combating conspiracies driven by race-based animus. *Id.* (citations omitted).

The Eleventh Circuit ultimately held that "if *Griffin*'s 'perhaps otherwise

class-based, invidiously discriminatory animus' means anything at all—and we think it does—it includes sex-based animus against women." *Id.* The *Lyes* court pointed to the fact that sex-based classifications receive heightened scrutiny under the Equal Protection Clause. *Id.* The *Lyes* court also considered legislative history, finding that it was not manifestly inconsistent with the court's holding because "at least some members of Congress believed actionable conspiracies would include those 'against a person because he was a Democrat . . . or because he was a Catholic, or because he was a Methodist, or because he was a Vermonter . . . .'" *Id.* at 1338 (quoting *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993) (Souter J., concurring in part and dissenting in part) (discussing remarks of Senator Edmunds, who managed the bill on the Senate floor)). The court ultimately held that although many legislators who voted for the statute were not concerned about affording legal protection to women as a class "[g]iven prevailing attitudes at the time § 1985(3) was enacted," it confirmed the plain meaning of the statute because "statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed" (*id.* (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 118 (1998))) and "[a]ny conclusion that women are not a protected class under § 1985(3) would run into a solid wall of contrary precedent." *Id.*

But the Court declines to stretch the outer limits of *Lyes*'s holding, which this Court readily reads as confined to including *all women* as a class protected within

the meaning of section 1985(3), to the prototypical "class of one" the operative complaint describes here.  Plaintiffs neither cite, nor has the Court found, any binding precedent compelling the conclusion that a class of one can maintain a section 1985 conspiracy claim.

In fact, several circuit Courts have held that a class of one is not covered under section 1985(3).  *See, e.g.*, *Jackson v. Gordon*, 145 F. App'x 774, 778 (3d Cir. 2005) (affirming the dismissal of a section 1985 conspiracy claim in which an inmate sued various entities for denying him a therapeutic diet, finding that the inmate "did not allege race- or class-based animus sufficient to state a claim under 42 U.S.C. § 1985(3)); *C&H Co. v. Richardson*, 78 F. App'x 894, 898–901 (4th Cir. 2003) (holding that although the Equal Protection Clause prohibits intentional discrimination even against a "class of one," the district court properly granted summary judgment on plaintiff's § 1985(3) claims where plaintiff did not allege that the complained-of discrimination resulted from its membership in any qualifying class); *Underfer v. University of Toledo*, 36 F. App'x 831, 834 (6th Cir. 2002) (holding that although the Supreme Court "affirmed the existence of a 'class of one' under an egregious set of circumstances in the equal protection context," it did not read that decision to "alter the text or legislative aims of the relevant sections of Title 42" and therefore, the plaintiff there did not allege that he was entitled to protections afforded by § 1985(3)).

The Court further finds that such a broad interpretation would be inconsistent with the Supreme Court's mandate that courts give full effect to the

25

statute's congressional purpose by "requiring, as an element of the cause of action, the kind of invidiously discriminatory motivation stressed by the sponsors of the limiting amendment" and its explanation for that mandate, that a conspiracy "must aim at a deprivation of the equal enjoyment of rights secured by the law to all." *See Griffin*, 403 U.S. at 102.  Because the Court finds that Plaintiffs have not adequately pleaded a § 1985(3) conspiracy claim, the Court declines to reach Defendants' intracorporate conspiracy argument.

Accordingly, the Motion to Dismiss is granted as to Count V.

**IV.   <u>Claims against specific entities.</u>**

**A. Whether municipal liability attaches to the City of Naples.**

Generally, as a municipality, the City of Naples cannot be held vicariously liable under section 1983 for constitutional violations committed by its officers.  *See Hoefling v. City of Miami*, 811 F.3d 1271, 1279 (11th Cir. 2016) (citing *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 693–94 (1978)).  Plaintiffs must ultimately "prove that the City had a policy, custom, or practice that caused the deprivation." *Id.* (citations omitted).

*Monell* limits section 1983 liability "to acts which the municipality has officially sanctioned or ordered."  *Id.*  A municipality causes a violation where (1) it acts via "an official policy enacted by its legislative body (e.g., an ordinance or resolution passed by a city council)"; (2) "final policymakers have acquiesced in a longstanding practice that constitutes the entity's standard operating procedure"; or (3) "on the basis of ratification when a subordinate public official make an

unconstitutional decision and when that decision is then adopted by someone who does have final policymaking authority." *Id.*

Plaintiffs appear to argue that municipal liability attaches under the second and third avenues. (Doc. 33 at 15).

With respect to the final policymaker avenue, "[m]unicipalities are generally only liable for a single decision made by a municipal official when the official is the final policymaker for the municipality with respect to the subject matter in question." *Ratlieff v. City of Fort Lauderdale, Fla.*, No. 22-CV-61029-RAR, 2023 WL 3750581, at *15 (S.D. Fla. June 1, 2023) (quoting *Mandel v. Doe*, 888 F.2d 783, 791 (11th Cir. 1989)). But "identifying and proving that a final policymaker acted on behalf of a municipality is 'an evidentiary standard, and not a pleading requirement.'" *Id.* (quoting *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 510 (2002)). Although Plaintiffs may ultimately have to identify (and provide proof concerning) a single final policymaker to survive summary judgment or prevail at trial, Plaintiffs do not have to name that person in their complaint to survive a Rule 12(b)(6) motion. *Hoefling*, 811 F.3d at 1279. Instead, to survive a Rule 12(b)(6) motion, Plaintiffs are only required to "allege a policy, practice, or custom of the City" which caused the constitutional violation. *See id.* "A custom is a practice that is so settled and permanent that it takes on the force of law." *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997). A custom does not need to receive "formal approval from the municipality," but "random acts or isolated incidents are insufficient to establish a custom or policy." *George's Place, LLC v. Smith*, No. 3:11-

cv-1096-J-37JBT, 2012 WL 360161, at *9 (M.D. Fla. Feb. 2, 2012) (quoting *Depew v. City of St. Mary's Ga.*, 787 F.2d 1496, 1499 (11th Cir. 1986)).

As to the third avenue, "ratification exists when a subordinate public official makes an unconstitutional decision and when that decision is then adopted by someone who does have final policy making authority." *Matthews v. Columbia Cty*, 294 F.3d 1294, 1297 (11th Cir. 2002). The final policymaker must ratify "not only the decision itself, but also the unconstitutional basis for it." *Id.* "[L]ocal government policymakers had [to have] an opportunity to review the subordinate's decision *and* agreed with both decision and the decision's basis." *Garvie v. City of Ft. Walton Beach*, 366 F.3d 1186, 1189 (11th Cir. 2004) (emphasis added) (citations omitted). For example, "[a] well-intentioned lawmaker who votes for [] legislation— even when he votes in the knowledge that others are voting for it for an unconstitutional reason and even when his unconstitutionally motivated colleague influences his vote—does not automatically ratify or endorse the unconstitutional motive." *Matthews*, 294 F.3d at 1297.

The Amended Complaint alleges that (1) Mayor Barnett made disparaging statements about Mr. Zea and his projects, expressing an intent to actively work against him (Doc. 28 at ¶ 21); (2) other city officials and employees at all levels of city government began assisting Mayor Barnett in his campaign against Mr. Zea (*id.* at ¶ 22); (3) the City Manager stated "we're not doing anything for him" regarding Mr. Zea, and that this became city policy (*id.* at ¶ 23); and (4) Mr. Zea became part of a class of developers disfavored by the city and its body politic (*id.* at

¶ 26).  For the purposes of a motion to dismiss, and assessing the allegations in the light most favorable to Plaintiffs, these statements, taken together, sufficiently allege that the City of Naples had a policy or practice of treating Zea differently that caused the alleged constitutional violation.  Accordingly, the municipal liability portion of the Motion to Dismiss is denied as to the City of Naples.

### B. Whether Mayor Barnett and Mr. Molé are protected by qualified immunity.

"A complaint is subject to dismissal under Rule 12(b)(6) when its factual allegations, on their face, establish an affirmative defense that bars recovery." *Myrick v. Fulton Cnty., Ga.*, 69 F.4th 1277, 1297 (11th Cir. 2023) (citing *Ingram v. Kubik*, 30 F.4th 1241, 1250 (11th Cir. 2022)).  "That means that if a defendant raises the affirmative defense of qualified immunity, the district court must dismiss any claims that do not allege a violation of clearly established law." *Id.* (citing *Ingram*, 30 F.4th at 1250).

Qualified immunity "shields a government official from liability unless he violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* (quoting *Piazza v. Jefferson Cnty.*, 923 F.3d 947, 951 (11th Cir. 2019)).  Qualified immunity balances two public interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Baker v. City of Madison, Alabama*, 67 F.4th 1268, 1278 (11th Cir. 2023) (citing *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).

First, the defendant asserting the qualified immunity defense bears the

initial burden of showing that he or she was acting within his or her discretionary authority. *Myrick*, 69 F.4th at 1297 (citing *Piazza*, 923 F.3d at 951); *see also Storck v. City of Coral Springs*, 354 F.3d 1307, 1314 (2003) ("Under qualified immunity analysis, the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly unconstitutional acts took place."). Only after the defendant makes that showing does "the burden shift to the plaintiff to show that qualified immunity is not appropriate." *Myrick*, 69 F.4th at 1297 (citing *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)).  To determine whether a defendant acted within his or her discretionary authority, courts in the Eleventh Circuit "assess whether they are of a type that fell within the employee's job responsibilities." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004).  The inquiry is two-fold.  First, courts ask whether the government employee was "performing a legitimate job-related function (that is, pursuing a job-related goal)." *Id.*  Second, courts ask whether the employee was performing that function "through means that were within his power to utilize." *Id.* at 1265–66. The inquiry is not whether it was within the defendant's authority to violate someone's constitutional rights, but rather courts "look to the general nature of the defendant's action, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances." *Id.*

Mayor Barnett and Mr. Molé have met their burden as to certain of the actions alleged.  For example, the Court agrees with Defendants that "deciding

whether to issue, extend, and revoke building permits; issuing stop-work orders; ensuring compliance with the Building Code; and issuing violation notices were all within Molé's discretionary authority as Chief Building Official.  (Doc. 40 at 13–14). The Court also agrees with Mayor Barnett that it is "within a mayor's discretionary authority to communicate with members of the public about a real estate development in the mayor's city."  (*Id.* at 14).  But Defendants have not argued that Mr. Molé's direction to an individual to send an email to Royal Harbor residents asking whether they supported condemnation of certain properties was within his discretionary authority.  (*See* Doc. 28 at ¶¶ 62–64).  Nor do Defendants argue that Mr. Molé's decision to call the police and falsely accuse a citizen of misconduct was within his discretionary authority.  (*See id.* at ¶ 80).  And, with respect to Mayor Barnett, Defendants have not argued that Mayor Barnett's call to a family member of a campaign supporter to discussing having that family member buy the Bay Club properties (which were not for sale) was discretionary.  (*See id.* at ¶ 44).  While it is possible that these allegations will not prove particularly relevant later in the case or that discovery will not support them, at this early stage of the case, the Court cannot dismiss this action against Mayor Barnett and Mr. Molé without, at the very least, specific arguments as to whether each alleged action was discretionary .

Accordingly, the Motion to Dismiss is denied without prejudice to the extent it seeks dismissal of the claims against Mayor Barnett and Mr. Molé because Defendants have not argued that all of their alleged actions against Plaintiffs were discretionary.  They may reassert qualified immunity at the summary judgment

stage.  To the extent that a second amended complaint is filed and government actors are named, the Court will consider further arguments regarding qualified immunity.

### C. Duplicate official capacity claims.

Finally, Defendants argue that the Court should dismiss Plaintiffs' claims against Mayor Barnett and Mr. Molé in their official capacities "because they are needlessly redundant of Plaintiffs' claims against the City."  (Doc. 29 at 19–20). Notably, although they had two opportunities to do so, Plaintiffs never meaningfully responded to this argument.  (*See* Doc. 33; Doc. 44).  "Because suits against a municipal officer sued in his official capacity and direct suits against municipalities are functionally equivalent, there no longer exists a need to bring official-capacity actions against local government officials, because local government units can be sued directly."  *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991); *see also Harris by and through Davis v. Autry*, No. 20-13480, 2022 WL 392169, at *6 (11th Cir. Feb. 9, 2022) (quoting *Busby*, 941 F.2d at 776).  Accordingly, the Court grants the Motion to Dismiss the official-capacity claims against Mayor Barnett and Mr. Molé.

*-Remainder of page intentionally left blank-*

32

## CONCLUSION

For the reasons set forth above, it is **ORDERED**:

1.      The Motion to Dismiss (Doc. 29) is **GRANTED in part** and **DENIED in part**.

2.      The Motion to Dismiss is **GRANTED** to the extent that (i) Counts III, IV, and V are dismissed without prejudice and (ii) all counts alleging that Mayor Barnett and Mr. Molé are liable in their official capacities are dismissed without prejudice.  The Motion to Dismiss is otherwise **DENIED**.

3.      Plaintiffs shall file a second amended complaint no later than September 26, 2023.  Failure to do so within that time frame may result in dismissal without further notice from the Court.

**ORDERED** in Fort Myers, Florida on September 5, 2023.

JOHN L. BADALAMENTI
UNITED STATES DISTRICT JUDGE